# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHRISTOPHER EGLI,**<br>   *Plaintiff,*<br>  v.<br>**CHESTER COUNTY LIBRARY SYSTEM,** *et al.*,<br>   *Defendants.* | **CIVIL ACTION NO. 18-4012** |

## MEMORANDUM OPINION

**Rufe, J.**                                **August 12, 2019**

*Pro se* Plaintiff Christopher Egli filed suit against Defendants Chester County Library System ("CCLS"), Montgomery County Library System ("MCLS"), Pennsylvania Cable Network ("PCN"), National Public Radio ("NPR"), and WHYY, Inc., asserting violations under 42 U.S.C. § 1983, the Civil Rights Act of 1964, the Cable Communications Policy Act of 1984, and the Equality Act of 2010. Defendants have filed motions to dismiss Plaintiff's Complaint, and Plaintiff has filed a motion to add Lower Merion Township to the list of Defendants. Upon consideration of the motions and responses thereto, Defendants' motions to dismiss will be granted, Plaintiff's claims will be dismissed with prejudice and without leave to amend, and Plaintiff's motion to add Lower Merion Township will be dismissed as moot.

### I.   BACKGROUND[1]

In early 2018, Plaintiff published a book titled "The Phantom Ogre; Exploring the Upside-Down World of anti-Semitism." According to Plaintiff, the book "examines the issue of anti-Semitism, offering ideas and thoughts about its causes and origins" while "simultaneously

---

[1] The following facts, unless otherwise noted, are taken from the Complaint and assumed to be true for purposes of the motions.

offering a critique of Judaism." Plaintiff sought to publicize his book and opinions at local libraries and through other media sources, without success.

In June and July 2018, Plaintiff allegedly contacted CCLS, which comprises 18 libraries, including Easttown Library. The "Materials Selection Policy" section of its website states that CCLS "strengthens and leverages the power of the public libraries in [its] community to ensure that every resident of Chester County has access to exceptional opportunities to read, learn, create, connect and contribute to a better quality of life." The Adult Program Coordinator of CCLS initially expressed interest in Plaintiff's presentation and asked for a copy of his book to review, but later emailed him back stating that the book talk does not meet CCLS' programming guidelines and included the following passage:

> As with all Library-sponsored events, only those programs that promote and extend the Library's collections, services, goals and mission will be considered. A Library-sponsored program must not promote the services, products, or philosophy of an individual group.

Plaintiff alleges that this rejection was improperly based on the political content of the book, rather than according to the policy.

Plaintiff alleges that MCLS engaged similar conduct in rejecting his book and offer to present, which according to Plaintiff, consists of over 25 libraries, including Ludington Library. Despite Plaintiff's admitted inability to locate any specific policies of MCLS, he nonetheless alleges that MCLS cannot "pick and choose which religious views to promote – or exclude," particularly when it is publicly funded.

Plaintiff also alleges that PCN is a Pennsylvania-based television network which offers its programming throughout the Commonwealth in most cable packages. According to Plaintiff, PCN "is funded through subscriber fees paid by participating cable companies, and is regulated under 'The Cable Act.'" Plaintiff allegedly receives the network in his home through his Xfinity

contract, and occasionally watches its "PA Books" program, which "offers one-on-one interviews with authors whose books are 'of interest to Pennsylvanians.'" Plaintiff wrote to PCN to request that he be featured on its "PA Books" program. PCN's director asked for a copy of Plaintiff's book to review, and a few weeks later, told Plaintiff that PCN was not "interested in interviewing him, adding[] 'the PA Books series focuses on nonfiction books with a Pennsylvania connection.'" Plaintiff alleges that PCN's decision in declining to interview him on its program reflected a "double standard" in deciding what was related to Pennsylvania, and that PCN simply did not want "to air political content [it] found objectionable."

Plaintiff alleges that he regularly listens to NPR, which he states is "partly funded by taxes, and [] regulated by the FCC." He admits in his Complaint that he has a long history of contacting NPR, "clogging NPR inboxes with emails, tweets, and comments to Management and the Ombudsman." Although NPR allegedly has broadcast some of his views "on general topics such as regulations, elections, the 2nd amendment, or other issues," it has never broadcast his criticisms of Israel. As Plaintiff explains, he submitted "hundreds of comments to NPR throughout 2017 and 2018 criticizing Israel and decrying NPR's coverage of anti-Semitism." Additionally, after writing his book, he allegedly wrote dozens of emails to two NPR radio shows to appear as a guest, "[n]one of [whom] were interested in discussing or disseminating [his] views." Such disinterest by NPR, according to Plaintiff, reflects "a policy . . . of stifling free speech where Israel is concerned" and that "NPR excluded his views because they were critical of one particular religion – Judaism – that is regularly accorded preferential treatment in NPR reporting."

Finally, Plaintiff brings claims against WHYY, which allegedly airs an interview program called "Radio Times" in Philadelphia and, like NPR, is "partly funded by taxes, and []

regulated by the FCC." According to Plaintiff, the program "routinely presents Israel in a favorable and sympathetic light, rarely including critics of Israel as guests." Plaintiff allegedly has written to the program "with some regularity" in the past few years, and although some of his comments have been accepted and sometimes read on air, he alleges that his opinions about Israel have always been screened by someone who told him that his "phone connection was bad, or put him on hold till the program was over." Additionally, after announcing the publication of his book and his desire to become a guest on WHYY's program, he received no reply from WHYY, which he attributes to "policies favoring Israel."

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint for failure to state a claim upon which relief can be granted is appropriate where a plaintiff's "plain statement" lacks enough substance to demonstrate that he is entitled to relief.[2] In determining whether a motion to dismiss should be granted, the court must consider only those facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the non-moving party.[3] As Plaintiff is proceeding *pro se*, the Court "must liberally construe his pleadings."[4]

Courts are not, however, bound to accept as true legal conclusions framed as factual allegations.[5] Something more than a mere *possibility* of a claim must be alleged; a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."[6] The complaint must

---

[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[3] *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *Fay v. Muhlenberg Coll.*, No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. Jan. 24, 2008).

[4] *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003) (citation omitted).

[5] *Twombly*, 550 U.S. at 555, 564.

[6] *Id.* at 570.

set forth "direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory."[7] Deciding a motion to dismiss, courts may consider "only allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."[8]

### III. DISCUSSION

#### A. Section 1983 Claims and the First Amendment

Plaintiff brings claims under 42 U.S.C. § 1983 against Defendants based on violations of his First Amendment rights. Section 1983 is not a source of substantive rights, but a means of vindicating violations of federal constitutional and statutory rights committed by state actors.[9] To state such a claim, a plaintiff therefore must allege (1) a deprivation under the Constitution or laws of the United States, (2) by a person acting under color of state law.[10]

#### 1. Library Defendants: CCLS and MCLS

Municipalities and other bodies of local government are considered to be "persons" within the meaning of § 1983, and can be sued for damages under the statute.[11] As Plaintiff has alleged that CCLS and MCLS comprise public libraries, which are "funded through taxes on the residents of their respective counties,"[12] and as these Defendants have not at this stage argued

---

[7] *Id.* at 562 (internal quotation marks and citations omitted).

[8] *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Brown v. Daniels,* 128 F. App'x 910, 913 (3d Cir. 2005) (quoting *Lum v. Bank of Am.,* 361 F.3d 217, 222 n.3 (3d Cir. 2004)).

[9] *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citation omitted).

[10] *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

[11] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988); *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

[12] Compl. [Doc. No. 1] ¶ 1.

otherwise, they will be treated as municipalities and therefore state actors for purposes of their motions to dismiss.[13]

Even assuming that CCLS and MCLS are state actors, however, Plaintiff also must allege a constitutional injury that was caused when the municipality acted pursuant to a custom or policy.[14] There cannot be redress under § 1983, particularly where a custom or policy is at issue, without establishing an underlying violation of a federal constitutional or statutory right.[15] Plaintiff asserts that his constitutional injury stems from an improper content-based rejection of his offer to provide his book and present on it at libraries in violation of the First Amendment.[16] Thus, Plaintiff does not argue that he has been denied access to the libraries' facilities, but that the library has not made his book available to other patrons.[17]

---

[13] The Third Circuit has previously held in the § 1983 context that the Commonwealth of Pennsylvania's involvement with a public library was significant enough to find that the state was a joint participant with the library. *Hollenbaugh v. Carnegie Free Library, of Connellsville, Pa.*, 545 F.2d 382, 385 (3d Cir. 1976). The decision was based on applying a nexus test to determine whether the library could be considered a state actor, weighing a series of factors including the percentage of the library's funds which came from state and local government financing, the number of the library's trustees appointed by governmental bodies, the fact that local municipalities passed resolutions designating the library as their agent, and that the city enacted an express tax to support the library. *Id.* at 384; *cf. Chalfant v. Wilmington Inst.*, 574 F.2d 739, 758–59 (3d Cir. 1978) (holding that because the Wilmington Institute imposed no express tax, its Board of Managers was privately appointed, and there was little evidence of significant governmental involvement, it was not considered a state entity for purposes of § 1983).

[14] *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992) (citation omitted).

[15] *City of Racho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 119–20 (2005).

[16] Compl. [Doc. No. 1] ¶ 13.

[17] The Third Circuit's decision in *Kreimer v. Bureau of Police*, for instance, addressed library policies which regulated the behavior and personal hygiene of persons wishing to freely access the information provided by a library. 958 F.2d 1242 (3d Cir. 1992). In *Kreimer*, a homeless man was expelled from public library premises due to his history of disrupting other library users and lack of personal care. *Id.* at 1247. After challenging the library's policy in part under the First Amendment right to receive information, the Third Circuit held that the policy prohibiting behavior inconsistent with the library's purposes in acquiring "knowledge through reading, writing and quiet contemplation" were upheld under a reasonableness standard. *Id.* at 1261–63. The personal hygiene policy, on the other hand, was subjected to strict scrutiny, but the court upheld that policy as sufficiently narrow in maintaining the library's facilities in a sanitary manner. *Id.* at 1264.

Libraries have broad discretion in determining the content of their collections. As the Supreme Court's plurality decision in *United States v. American Library Association*[18] ("*ALA*") held in the context of content-based internet filtering, library internet access is "no more than a technological extension of the book stack,"[19] and public libraries require and merit "broad discretion" to make content-based decisions in collection and internet management since their purpose is to offer selective access of information to the public.[20]

CCLS and MCLS, according to the allegations of the Complaint, exercised that discretion here. Plaintiff cannot allege a claim associated with a library's rejection of a particular book. Libraries are not required to accommodate every book or proposed talk, but instead must determine based on their professional judgment which materials are deemed to have "requisite and appropriate quality" to occupy the limited space available.[21] There is nothing in the Complaint to suggest that either MCLS or CCLS had policies or customs that are inconsistent with this constitutionally permissible discretion or that target certain viewpoints. He alleges only that his book and proposed talk were not accepted, but as Plaintiff does not have a constitutional right to be included in a library collection, he has failed to state a plausible § 1983 claim against CCLS and MCLS.

---

[18] 539 U.S. 194 (2003).

[19] *Id.* at 207 (internal quotation marks and citation omitted).

[20] *See id.* at 205 ("Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them."); *cf. Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871–72 (1982) ("As noted earlier, nothing in our decision today affects in any way the discretion of a local school board to choose books to *add* to the libraries of their schools. Because we are concerned in this case with the suppression of ideas, our holding today affects only the discretion to *remove* books. In brief, we hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books . . . .").

[21] *See ALA*, 539 U.S. at 204 ("Although they seek to provide a wide array of information, their goal has never been to provide 'universal coverage.'" (citation omitted)).

## 2. Media Defendants: PCN, NPR, and WHYY

Defendants PCN, NPR, and WHYY argue that the § 1983 claims against them should be dismissed for failure to state a claim because Plaintiff has failed to allege that they are state actors, and Plaintiff has no First Amendment right to be granted airtime by these entities. This Court agrees.

Section 1983's "color of state law element is a threshold issue; there is no liability under § 1983 for those not acting under color of law."[22] A private entity may be considered a state actor under limited circumstances, where "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."[23] In order to assess whether such entity may be deemed a state actor, three tests apply:

> (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.[24]

Each of these inquiries focuses on whether the government is responsible for the specific conduct alleged by Plaintiff.[25] Determining whether these Defendants are state actors therefore necessitates a fact-based analysis of the allegations in the Complaint.[26]

The Third Circuit has explicitly held over the last two decades that private entities do not transform into state actors under § 1983 simply because they may receive extensive government

---

[22] *Groman*, 47 F.3d at 638 (citing *Versarge v. Twp. of Clinton, N.J.*, 984 F.2d 1359, 1363 (3d Cir. 1993)).

[23] *Borrell v. Bloomsburg Univ.*, 870 F.3d 154, 160 (3d Cir. 2017) (citation and emphasis omitted); *see also Glunk v. Noone*, 186 F. Supp. 3d 453, 460 (E.D. Pa. 2016) ("The necessary 'close nexus' exists where the state exercises coercive power or provides 'such significant encouragement, either overt or covert,' deeming the conduct state action." (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999))).

[24] *Borrell*, 870 F.3d at 160 (quoting *Kach v. Horse*, 589 F.3d 626, 646 (3d Cir. 2009)).

[25] *Id.*

[26] *Max v. Republican Comm. of Lancaster Cty.*, 587 F.3d 198, 200 (3d Cir. 2009) (citation omitted).

regulation and funding.[27] In the context of the First Amendment cases, the Supreme Court has held that extensive government regulation does not transform a private entity into a state actor.[28] Rather, "a private entity can qualify as a state actor in a few limited circumstances— including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity."[29]

Here, Plaintiff solely alleges that PCN is a Pennsylvania-based television network which "is funded through subscriber fees paid by participating cable companies, and is regulated under 'The Cable Act.'"[30] Plaintiff also alleges that NPR and WHYY are both "partly funded by taxes, and [] regulated by the FCC."[31] Plaintiff has not adequately alleged in his Complaint that any of these Defendants "acted under color of state law" when each of them allegedly refused Plaintiff's request to discuss his book and opinions on the air.[32]

---

[27] *See Gross v. R.T. Reynolds, Inc.*, 487 F. App'x 711, 719 (3d Cir. 2012) ("[A] private entity does not become a state actor for the purpose of § 1983 simply because it is subject to state regulations or receives funding from the state." (citations omitted)); *Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 244 (3d Cir. 2002) ("[T]he presence of both these elements—regulation and flow of funds—that are separately unpersuasive in the state action inquiry does not amount to more than each alone; the combination brings no greater result— namely, no state action.").

[28] *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (providing that the First Amendment's Free Speech Clause "prohibits only *governmental* abridgment of speech" (emphasis in original)); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974) ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State . . . .").

[29] *Halleck*, 139 S. Ct. at 1928 (internal citations omitted)).

[30] Compl. [Doc. No. 1] ¶¶ 1, 14.

[31] *Id.* ¶ 2.

[32] *See Halleck*, 139 S. Ct. at 1932 ("[T]he 'being heavily regulated makes you a state actor' theory of state action is entirely circular and would significantly endanger individual liberty and private enterprise."). Additionally, it is worth noting that PCN has provided through its publicly accessible website that it is a private, non-profit organization, which "receive[s] no federal or state funding" and "is supported through a monthly per-subscriber fee paid by participating cable companies that carry us on their channel lineup." Reply to Resp. to Mot. [Doc. No. 33] at 5. NPR has noted that various district courts and circuit courts have held that it is a non-profit organization and is not a state actor. Mem. of Law in Supp. of Mot. to Dismiss [Doc. No. 26-1] at 7 (citing *Shulman v. Facebook.com*, No. 17-764, 2017 WL 5129885, at *4 (D.N.J. Nov. 6, 2017); *Abu-Jamal v. Nat'l Pub. Radio*, No. 96-594, 1997 WL 527349, at *4 (D.D.C. Aug. 21, 1997), *aff'd*, 159 F.3d 635 (D.C. Cir. 1998) (per curiam)). As expressed by the

Moreover, even if PCN, NPR, or WHYY could be considered a state actor, Plaintiff's allegations that he has been deprived of his First Amendment rights to appear on their programs are without constitutional merit. The Supreme Court held over 20 years ago that in the context of government-owned and operated media, "the First Amendment of its own force does not compel public broadcasters to allow third parties access to their programming."[33] In *Arkansas Education Television Commission v. Forbes*, a public television station's editorial judgments regarding private speech presented to its viewers did not violate any First Amendment rights because:

> Public and private broadcasters alike are not only permitted, but indeed required, to exercise substantial editorial discretion in the selection and presentation of their programming. . . . Were the judiciary to require, and so to define and approve, pre-established criteria for access, it would risk implicating the courts in judgments that should be left to the exercise of journalistic discretion.[34]

Although Plaintiff alleges that PCN decided it did not want "to air [Plaintiff's] political content [that PCN] found objectionable,"[35] it is well within the broad discretion of broadcasters

---

Third Circuit, "members of the media and a media company . . . generally do not qualify as state actors." *Chambers v. Phila. Media Network Inc.*, 548 F. App'x 755, 756 (3d Cir. 2014) (citation omitted).

Finally, Plaintiff's primary support in opposition to these Defendants' motions to dismiss derives from two cases involving public, educational, and governmental ("PEG") cable channels which expressly permitted citizens to broadcast their own programs on the stations' channels. Pl.'s Br. [Doc. No. 31] at 2 (citing *Demarest v. Athol/Orange Cmty. Television, Inc.*, 188 F. Supp. 2d 82, 84–85 (D. Mass. 2002); *Halleck v. Manhattan Cmty. Access Corp.*, 882 F.3d 300, 306 (2d Cir. 2018)). Not only are these two opinions unrelated to the instant case, as Plaintiff fails to allege that PCN, NPR, or WHYY are PEG channels or provide PEG channels, but the Supreme Court overruled the Second Circuit case he cites to in *Halleck*, and held that private non-profit corporations operating PEG channels are not state actors. *Halleck*, 139 S. Ct. at 1926. Neither of the Defendants are allegedly similar to the PEG channel in the District of Massachusetts case either, which provides: "[PEG] channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet. They provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas." *Demarest*, 188 F. Supp. 2d at 84–85. Although PEG channels may in some cases be treated more analogously to public libraries, as there is more open use allowed by the general public, it cannot be said from the face of the Complaint that PCN, NPR, or WHYY may be viewed in the same manner.

[33] *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 675 (1998).

[34] *See id.* at 673–74.

[35] Compl. [Doc. No. 1] ¶ 19.

such as PCN to choose among speakers expressing various viewpoints.[36] "Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others."[37] Similarly in the context of radio broadcasting regarding NPR and WHYY, "radio broadcasting station[s] [are] not [] public utilit[ies] in the sense that [they] must permit broadcasting by whoever comes to [their] microphones."[38] Because Plaintiff lacks any First Amendment rights to freely access PCN, NPR, or WHYY, all of whom exercised their constitutionally broad discretion in rejecting his requests, Plaintiff has failed to assert a viable § 1983 claim under the First Amendment.

### B. Cable Communications Policy Act of 1984

Plaintiff has brought prior cases asserting claims under § 531(e) of the Cable Communications Policy Act of 1984, and such claims "have been rejected repeatedly."[39] Nevertheless, Plaintiff again asserts such a claim against Defendants in this case.[40] Although Plaintiff did not cite to any specific section of the statute, it appears that he is bringing his claims under § 531(e) since it provides that "a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity . . . except [where it]

---

[36] *See Forbes*, 523 U.S. at 673 ("[T]elevision broadcasters enjoy the 'widest journalistic freedom' consistent with their public responsibilities." (citations omitted)). Furthermore, Congress rejected the argument that "broadcast facilities should be open on a nonselective basis to all persons wishing to talk about public issues." *Id.* (quoting *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 105 (1973)).

[37] *Id.* at 674.

[38] *McIntire v. Wm. Penn Broad. Co. of Phila.*, 151 F.2d 597, 601 (3d Cir. 1945); *see also Columbia Broad. Sys., Inc.*, 412 U.S. at 107–08 (noting that Congress rejected an attempt to impose "a limited obligation on broadcasters to turn over their microphones to persons wishing to speak out on certain public issues").

[39] *Egli v. Strimel*, 251 F. Supp. 3d 827, 844 (E.D. Pa. 2017).

[40] Additionally, the Court reminded Plaintiff that "he is bound by Federal Rule of Civil Procedure 11 and may be subject to sanctions for future filings that are frivolous or presented for an improper purpose." *Id.*

contains obscenity, indecency, or nudity."[41] As has been explained repeatedly, there is no private cause of action under § 531(e).[42]

Moreover, none of the Defendants in this case are "cable operators," which are defined as:

> [A]ny person or group of persons (A) who provides cable service over a cable system and directly through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system.[43]

"Courts have routinely interpreted the term 'cable operator' under the statute to apply to cable companies such as Verizon, Comcast, and Time–Warner, rather than individual television stations . . . or station managers."[44] Here, Plaintiff is alleging claims against a television network, two radio companies, and two public library systems, none of which could be construed as falling within the statute. Thus, Plaintiff's claims will be dismissed with prejudice.

### C. Civil Rights Act of 1964

Plaintiff also asserts a claim under the Civil Rights Act of 1964, but does not specify which Title of the Act is implicated in his claim. To the extent that he may potentially be asserting a claim for a violation of Title II, which prohibits discrimination in places of public accommodation, his claim is without merit.

---

[41] 47 U.S.C. § 531(e).

[42] *See, e.g.*, *Strimel*, 251 F. Supp. 3d at 840 ("Plaintiff cannot assert a claim under Section 531(e) of the Cable Communications Act because that provision provides no private right of action . . . ."); *Egli v. Strimel*, No. 14-6204, 2015 WL 5093048, at *3 n.5 (E.D. Pa. Aug. 28, 2015) (Restrepo, J.) ("Plaintiff's claim under 47 U.S.C. § 531(e) would fail because Section 531(e) does not provide for a private right of action to enforce violations." (citation omitted)); *Egli v. Comcast of Pa.*, No. 03-6231, 2004 WL 2166301, at *1 n.1 (E.D. Pa. Sept. 22, 2004) (Padova, J.) ("Congress did not intend to create a private right of action for public access users to enforce violations of § 531(e).").

[43] 47 U.S.C. § 522(5).

[44] *Strimel*, 2015 WL 5093048 at *3 (citing *Nat'l Cable & Telecomms. Ass'n v. F.C.C.*, 567 F.3d 659, 661 (D.C. Cir. 2009)).

Title II of the Civil Rights Act of 1964 provides: "All persons shall be entitled to full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."[45] Plaintiff fails to allege whether any Defendant qualifies as a place of public accommodation.[46] Moreover, even if any of the Defendants could qualify as public accommodations, Plaintiff has not asserted any viable claim as to a denial of his ability to enjoy the full use of Defendants' facilities and privileges on the basis of his membership in one of the listed protected classes under this statute.[47] Instead, Plaintiff demands that Defendants provide a forum for his views, which goes far beyond access on the same terms as others, and which clashes with Defendants' broad discretion within the confines of the First Amendment to determine what information may be relayed through their facilities. Plaintiff therefore has not been denied any right under the statute. As such, Plaintiff's claims under the Civil Rights Act of 1964 will be dismissed with prejudice.

### D. Equality Act of 2010

Plaintiff alleges that Defendants violated "the tenants of the Equality Act of 2010." The statute to which he refers appears to be a legislative act of the Parliament of the United Kingdom, and therefore is not applicable to this action.[48]

---

[45] 42 U.S.C. § 2000a(a).

[46] *See id.* § 2000a(b) (listing types of facilities covered as public accommodations).

[47] *See id.* § 2000a(a) (listing "race, color, religion, or national origin" as protected classes under the statute).

[48] Equality Act 2010, c. 15 (U.K.), Table of Contents, https://www.legislation.gov.uk/ukpga/2010/15/contents (last visited August 9, 2018).

## IV. LEAVE TO AMEND AND MOTION ADD DEFENDANT

In civil rights cases generally, the Third Circuit has held that courts must allow amendment, unless doing so would be inequitable or futile.[49] In this particular case, because Plaintiff has stated no plausible claims against Defendants, including any violations of his First Amendment rights under § 1983, the Court finds that amendment would be futile.[50] Thus, leave to amend will be denied and Plaintiff's pending motion to add Lower Merion Township to the Complaint will be dismissed as moot.[51]

## V. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss will be granted, Plaintiff's claims will be dismissed with prejudice and without leave to amend, and Plaintiff's motion to add Lower Merion Township will be dismissed as moot.

An appropriate order follows.

---

[49] *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007); *see also Dover Steel Co., Inc. v. Hartford Accident & Indem. Co.*, 151 F.R.D. 570, 574 (E.D. Pa. 1993) ("While under the Federal Rules of Civil Procedure leave to amend pleadings is to be granted with liberality, the allowance is not intended to be automatic." (internal citations omitted)).

[50] *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) ("Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted." (internal quotation marks and citation omitted)).

[51] In his motion, Plaintiff asks the court to permit him to add Lower Merion Township since he discovered that it owns Ludington Library, which allegedly denied Plaintiff his First Amendment rights, and not Defendant MCLS. Pl.'s Mot. to Add Lower Merion Township to List of Defs. [Doc. No. 21]. Because of his desire to pursue his claims related to the First Amendment under § 1983, which have been determined to be insufficient beyond repair, his motion to add Lower Merion Township will be dismissed as moot.